IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE: | Case No. 16-11230 |
| PostRock Energy Corporation, *et al.*[1] | Chapter 11 |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF CLARK EDWARDS, INTERIM PRESIDENT, CHIEF EXECUTIVE OFFICER AND DIRECTOR OF POSTROCK ENERGY CORPORATION, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Clark Edwards, pursuant to section 1746 of title 28 of the United States Code, declare under penalty of perjury as follows:

1. I am the Interim President, Chief Executive Officer, and a Director of PostRock Energy Corporation ("PostRock"), a Delaware corporation, one of the above-captioned debtors and debtors in possession (the "Debtors"), and ultimate parent of the affiliated Debtors. In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, books, and records.

2. On the date hereof, (the "Petition Date"), PostRock and five of its affiliates each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") thereby initiating the above-captioned cases (these "Chapter 11 Cases"). The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The Debtors in these chapter 11 cases include: PostRock Energy Corporation, PostRock Energy Services Corporation, PostRock Holdco, LLC, PostRock Eastern Production, LLC, PostRock MidContinent Production, LLC, and STP Newco, Inc.

**INTRODUCTION**

3.      Due to the sharp decline in oil prices and the sustained depression of gas prices caused by excess production and limited demand for these natural resources, the Debtors' revenues, profitability, and cash flows have been negatively affected.  Without sufficient liquidity and availability of capital, the Debtors' ability to acquire, explore, develop, produce, and gather crude oil and natural gas have also been severely limited by the industry and market trends and conditions.

4.      As a result of the Debtors' declining financial position, the Debtors ultimately defaulted under the terms of their Borrowing Base Facility (as defined below), rendering it necessary for the Debtors to initiate these Chapter 11 Cases.  At the request of the Agent (as defined below), the Debtors initiated these Chapter 11 Cases and agreed to the immediate appointment of a chapter 11 trustee in order to preserve its going concern value and to facilitate a sale of substantially all of its assets under the management and direction of a chapter 11 trustee.

5.      Prior to and consistent with the appointment of a chapter 11 trustee, the Debtors seek certain "first day" relief in the first day motions (the "First Day Motions") described herein in order to ensure a smooth transition into chapter 11 and, ultimately, a smooth transition of management control to a chapter 11 trustee.

6.      To familiarize the Court with the Debtors and the relief sought in the First Day Motions, this First Day Declaration is organized as follows:  Part I describes the Debtors' corporate background, business operations, and pre-petition organizational and capital structure. Part II describes the events leading to the commencement of these Chapter 11 Cases.  Finally, part III sets forth the relevant facts in support of each First Day Motion.

## I. THE DEBTORS' CORPORATE BACKGROUND, BUSINESS OPERATIONS, AND ORGANIZATIONAL AND PRE-PETITION CAPITAL STRUCTURE

### A. Corporate Background

7. PostRock was formed in 2009 to combine its predecessor entities, Quest Resource Corporation, Quest Energy Partners, L.P. and Quest Midstream Partners, L.P. into a single entity. Notwithstanding this combination, PostRock is and remains the ultimate parent of several other legal entities, including the following which are Debtors in these Chapter 11 Cases: PostRock Energy Services Corporation, PostRock Holdco, LLC, PostRock Eastern Production, and PostRock MidContinent Production, LLC.

8. Together, the Debtors operate as an independent oil and gas company engaged in the acquisition, exploration, development, production and gathering of crude oil and natural gas. The Debtors' primary production activity is focused in the Cherokee Basin, a 15-county region in southeastern Kansas and northeastern Oklahoma. In the Cherokee Basin, the Debtors own and operate over 2,500 wells and nearly 2,200 miles of gas gathering lines. The Debtors also have minor oil and gas producing properties in the Appalachian Basin.

9. In the Cherokee Basin, the Debtors produce conventional oil and coal bed methane gas. The Cherokee Basin properties are situated between the Forest City Basin to the north, the Arkoma Basin to the south, the Ozark Dome to the east and the Nemaha Ridge to the west. The Cherokee Basin is a mature producing area with respect to conventional oil producing reservoirs; such as, the Bartlesville and other Pennsylvanian age sandstones, which were initially discovered and developed beginning in the early 1900s.

10. The Appalachian Basin is one of the largest and oldest producing basins in the United States. The Debtors' main area of operation in the Appalachian Basin is West Virginia, where the producing formations range in depth from 1,500 feet to approximately 6,500 feet. The

Debtors' main production formations are the lower Devonian Marcellus Shale, the shallow Mississippian (Big Injun, Maxton, Berea, Pocono, Big Lime) and the Upper Devonian (Riley, Benson, Java, Alexander, Elk, Cashaqua, Middlesex, West River and Genesee, including the Huron Shale member and Rhinestreet Shales).

### B.    The Debtors' Business Operations

11.    The Debtors are engaged in the acquisition, exploration, development, production and gathering of crude oil and natural gas. The Debtors have approximately 129 employees between its Oklahoma City, Oklahoma headquarters and field employee offices in Kansas, Oklahoma, and West Virginia.

### C.    The Debtors' Organizational Structure

12.    PostRock is the parent company and wholly-owns debtor PostRock Energy Services Corporation ("PESC"), and a non-debtor entity, Constellation Energy Partners Management, LLC ("CEPM"). PESC wholly owns debtors PostRock Holdco, LLC ("Holdco"), PostRock Eastern Production, LLC ("Eastern"), and PostRock MidContinent Production, LLC ("MidContinent"). MidContinent wholly owns debtor STP Newco, Inc ("Newco").

13.    PESC is the primary operating entity for the Debtors, employing all personnel, and is the entity through which all general and administrative services occur. MidContinent owns all of the Debtors' assets in the Cherokee Basin. Eastern owns the Debtors' assets in the Appalachian Basin. Holdco holds a single asset in Kansas. Newco has no assets.

### D.    The Debtors' Pre-Petition Capital Structure

14.    On December 20, 2012, the Debtors completed a refinancing of their existing revolving credit facility with a new group of banks. The refinancing was structured as an amendment to the existing facility to minimize costs. At refinancing, the existing facility was amended and restated by the Third Amended and Restated Credit Agreement (the "Borrowing

Base Facility"), by and among PESC and MidContinent, as borrowers, Citibank, N.A. (the "Agent"), as administrative and collateral agent, and the lenders and other loan parties thereto (the "Lenders"). The Borrowing Base Facility, which is the Debtors' sole credit facility, is a $200 million senior secured revolving facility secured by a first lien on substantially all of the Debtors' assets, except the assets of non-debtor CEPM. The Borrowing Base Facility is also guaranteed by all the subsidiaries of the Debtors other than CEPM.

15.   As of the Petition Date, the principal outstanding amount claimed under the Borrowing Base Facility by the Agent is approximately $65 million.

## II.   EVENTS LEADING TO THESE CHAPTER 11 CASES

16.   Leading up to 2015, the Debtors struggled due to the sharp decline in oil prices and the sustained depression of natural gas prices caused by excess production and limited demand for these natural resources. Low prices for oil and natural gas significantly affects the Debtors revenues from the sale of their oil and gas production.

17.   Recognizing the current market and industry conditions, and the outstanding debt, the Debtors, with the assistance of experienced advisors, engaged in a broad marketing process seeking to sell substantially all of their assets beginning in February 2015. Despite the efforts of the Debtors and their sale advisors, however, the Debtors were unable to procure a sale that would result in the full satisfaction of its outstanding obligations under the Borrowing Base Facility.

18.   On November 17, 2015, the Agent notified the Debtors that it was reducing the borrowing base under the Borrowing Base Facility from $76 million to $39 million, due to the decline in oil and natural gas prices, the roll-off of hedges, and the production of reserves since May 1, 2015.

19.   As a result of the inability to locate a buyer, the Debtors then began to explore

restructuring alternatives with the support of a financial advisor beginning in January 2016. Specifically, the Debtors, the Agent, and the Lenders engaged in significant discussions regarding a restructuring transaction involving a debt for equity swap in a chapter 11 proceeding.

20. During the course of these negotiations, and on or about February 29, 2016, the Agent gave notice of default under the Borrowing Base Facility due to the borrowing base deficiency occurring after the borrowing base was reduced, and the Debtors' failure to make an interest payment when due.

21. On or about March 14, 2016, the Agent gave written notice to the Debtors that the Lenders had accelerated the balance of the Debtors' indebtedness under the Borrowing Base Facility, rendering the entire outstanding principal balance plus all accrued interest immediately due and payable.

22. Ultimately, the negotiations between the Debtors, the Agent, and the Lenders were unable to result in an agreed restructuring transaction. The Agent requested that the Debtors initiate these Chapter 11 Cases to facilitate a sale of substantially all of their assets, and that the Debtors consent to the immediate appointment of a chapter 11 trustee.

### III. EVIDENTIARY SUPPORT FOR THE FIRST DAY MOTIONS

23. As set forth above, the Debtors initiated these Chapter 11 Cases with the ultimate goal of a sale of substantially all of the Debtors' assets via a chapter 11 sale process. While the Debtors have agreed to the immediate appointment of a chapter 11 trustee, the First Day Motions seek relief that the Debtors believe is necessary to ensure a smooth transition into chapter 11, and ultimately, a smooth transition of management of the Debtors to a chapter 11 trustee.

24. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with

appropriate reliance on corporate officers and advisors.[2]

### IV. FIRST DAYS MOTIONS

#### A. Emergency Motion For Order Under Fed.R.Bankr.P. 1015(B) And Bankruptcy Local Rule 1015 Directing Joint Administration Of Cases (the "Joint Administration Motion")

25. As more particularly discussed in the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). The Debtors request that maintain one file and one docket be maintained for all of these Chapter 11 Cases under the case of PostRock and also request that an entry be made on the docket of each of the Chapter 11 Cases, other than the Chapter 11 Case filed by PostRock, to reflect the joint administration of these Chapter 11 Cases.

26. Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect PostRock and each of its affiliated entities that also have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor these Chapter 11 Cases with greater ease and efficiency.

27. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint

---

[2] All capitalized terms not otherwise defined herein have the meaning given to them in the applicable First Day Motion.

Administration Motion should be approved.

      **B.**    **Motion For Entry Of Emergency Interim Agreed Cash Collateral Order And For Expedited Hearing (the "Cash Collateral Motion")**

28. The Debtors (and the Chapter 11 Trustee upon appointment) have a need to use cash collateral on an emergency interim basis and on a permanent basis. The Debtors have negotiated the terms of use of cash collateral with the Agent for the interim use of cash collateral.

29. I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

      **C.**    **Emergency Motion For Order: (I) Authorizing Continuance Of Pre-Petition Insurance Program; And (II) Authorizing Payment Of Any Pre-Petition Premiums And Related Obligations; And (III) Directing Bank To Honor Checks For Pre-Petition Premiums (the "Insurance Motion")**

30. The Debtors seek authority (but not direction) to make the payments required to continue its Insurance Program, including payment of any pre-petition premium or other obligations under the Policies listed in the Insurance Motion.

31. In the ordinary course of its business, the Debtors maintain a carefully designed, vitally important Insurance Program. This program includes 2 insurance policies that were in effect as of the Petition Date, providing necessary coverage, including, but not limited to, policies covering the Debtors' general liability and property casualty. These Policies are provided by different insurance carriers.

32. The Debtors pay approximately $458,057 annually in aggregate premiums and related fees to procure and maintain the Insurance Program each year. The Debtors' package insurance is paid monthly, while the Debtors' property insurance is paid monthly.

33. In many cases, the coverage provided by the Policies is required by various regulations, indentures, laws and contracts that govern the Debtors' business conduct under applicable non-bankruptcy law. Likewise, the U.S. Trustee Guidelines for debtors-in-possession operating in chapter 11 cases in this Bankruptcy Court require the Debtors to maintain adequate insurance coverage. Such coverage could not be provided without the continuation of the entire Insurance Program.

34. I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**D. Emergency Motion For Order Under 11 U.S.C. §§ 105, 363 And 507, (I) Authorizing Payment Of Pre-Petition Employee Obligations And Related Amounts, (II) Confirming Right Of Debtors To Continue Employee Programs On Post-Petition Basis, (III) Confirming Right Of Debtors To Pay Withholding And Payroll-Related Taxes And (IV) Directing Banks To Honor Pre-Petition Checks For Employee Obligations (the "<u>Employee Motion</u>")**

35. The Debtors request entry of an order authorizing, but not directing, the Debtors to pay, continue or otherwise honor pre-petition obligations to or for the benefit of their current employees for salaries and other compensation and benefits under all plans, programs and policies implemented by the Debtors prior to the Petition Date. The Debtors seek immediate authority to make payments to Employees on account of Pre-petition Employee Obligations.

36. The Debtors also seek authorization to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the Pre-petition Employee Obligations, including but not limited to, all withholding taxes, Social Security taxes and Medicare taxes. In addition, the Debtors seek confirmation that they are permitted to pay to third

parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees, including, without limitation, garnishments, charitable contributions, support payments, tax levies, benefit plans, insurance programs and other similar programs.

37.  As more particularly identified and discussed in the Employee Motion, the Debtors further request that they be authorized, but not directed to, pay the hourly fees of five independent consultants for pre-petition services that, with respect to the Independent Consultants, provide crucial, highly specialized skills, including, among other things, accounting, information technology, human resources, and field support, all of which are necessary for the operation of the Debtors' businesses.  The Debtors also seek authority (but not direction) to continue the payments that may come due to their Independent Consultants post-petition in the ordinary course of their business.

38.  The Debtors further request that, with respect to any Employee Programs and Pre-Petition Employee Obligations that are administered or paid through a third-party administrator, agent, consultant or provider (the "Administrators"), the Debtors be expressly authorized to pay any pre-petition fees of the Administrators and to continue such payments post-petition in the ordinary course of their business in order to ensure the uninterrupted delivery of payments or other benefits to the Employees.

39.  The Debtors' ability to preserve their businesses and maintain value is dependent on the continued enthusiasm, services and expertise of their Employees.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale of their Employees may be adversely affected if they are not able to assure them that they will be fully paid for the work they have performed or will perform, whether before or after the Petition Date, and can rely on the benefits provided to them under the Employee Programs.  The

Debtors have determined that continuation of the Employee Programs will be vital to their ability to preserve key Employee morale during the pendency of these Chapter 11 Cases and to reduce the level of Employee attrition that might otherwise occur. Minimizing such attrition and the consequent disruption to the Debtors' business operations is critical to the Debtors' ability to preserve and enhance value for the benefit of the Debtors, their estates and all stakeholders.

40. In addition, if the Debtors fail to pay the Pre-petition Employee Obligations in the ordinary course, their Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on employee morale and likely would result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. Honoring the Pre-petition Employee Obligations will minimize the level of disruption and preserve the loyalty of Employees so necessary for any successful reorganization.

41. As of the Petition Date, the Debtors' aggregate workforce consists of 129 Employees.

42. Of the Employees, 57 are employed on a salaried basis and 72 are employed on an hourly basis. All full-time Employees, whether salaried or paid hourly, are eligible to participate in the Employee Programs. In the ordinary course of the Debtors' businesses, the Debtors' Employees earn and are paid salaries and/or other compensation on a bi-weekly basis on the 1st and 15th of the month.

43. I believe that the relief requested in the Employee Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Motion

should be approved.

> **E. Emergency Motion For Authority To Pay In The Ordinary Course (I) Undisputed Prepetition Joint Interest Billings And Other Obligations Owing Under Oil & Gas Leases; (II) Undisputed Prepetition Claims Subject To Statutory Liens; And (III) Undisputed Obligations Or Taxes Owed To Governmental Authorities (the "<u>JIB and Royalties Motion</u>")**

44. The Debtors seek authority to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing with respect to: (i) proceeds of production received by the Debtors attributable to non-operating working interest owners and royalty owners; (ii) certain operators for unpaid joint-interest billings and similar claims on wells in which the Debtors own a non-operating working interest; (iii) third parties, including vendors, contractors, drillers, haulers and suppliers of oil and gas related services who may have, or may be entitled to, liens under applicable state law and (iv) any obligations owed to state or federal taxing authorities and regulatory agencies related to or arising from the receipt of proceeds of production received by the Debtors post-petition attributable to any of the well interests held by the Debtors. Amounts for such Obligations have accrued prepetition but will not be paid or owed until after the Petition Date. The Debtors anticipate receiving invoices postpetition for JIBs and work performed by Lien Claimants relating to prepetition oil and gas operations and desire to pay the same in the ordinary course of business to preserve the value of the Debtors' mineral interests. Revenues from the sale of oil, natural gas, and natural gas liquids are paid to Interest Holders the second month after actual sale of the product.

45. The Debtors' operations are focused on the exploration, development, and production of oil and natural gas in the Cherokee Basin (Oklahoma/Kansas) and the Appalachian Basin (West Virginia).

46. <u>Interest Owners</u>. The Debtors serve as the operator for the majority of the oil and gas wells in which the Debtors hold an interest. In addition to assuring that these wells keep

operating and producing, the operator often markets and sells the produced oil and gas for the Interest Owners, distributes the proceeds representing the Interest Owners' share of production to various Interest Owners and pays the applicable taxes and other amounts owing with respect to operation of the wells. Under applicable state laws, failure to timely pay non-operating Interest Owners the revenue to which they are respectively entitled under the applicable leases and related agreements can give rise to statutory lien claims, contentious litigation over unpaid royalty and/or attempts to remove the Debtors as the well operator.

47. <u>JIBs</u>. Although the Debtors generally operate the wells in which they own an interest, there are certain instances in which the Debtors hold non-operating working interests in wells. In such instances, the Debtors receive payment representing their share of production revenues. The Debtors also receive monthly invoices from the operator for the Debtors' share of the drilling and completion costs, as well as operating costs (generally referred to, together with other invoiced items, as a JIB). Failure to timely pay JIBs may provide grounds for contractual lien rights and/or statutory lien rights in favor of the operator against the Debtors' interest in the well. In addition, the operator may net the Debtors' revenue against the JIB to collect the outstanding amount. The Debtors seek only to pay undisputed prepetition JIBs on wells in which the Debtors own a non-operating working interest and undisputed amounts owed to Interest Owners as such have been paid in the Debtors' ordinary course of business.

48. <u>Lien Claimants</u>. As part of its exploration and production operations, the Debtors rely to a significant degree on a number of Lien Claimants who provide services, supplies, and materials necessary to ensure that the Debtors' oil and gas operations continue in a safe, effective and timely manner. In the ordinary course of its business, the Debtors incur obligations to the Lien Claimants and pay those Lien Claimants for their services.

49. While the Debtors generally make timely payments to the Lien Claimants, as of the Petition Date, certain Lien Claimants may not have received payments for prepetition goods and services or have failed to cash checks received prepetition. As a result, the Lien Claimants may have a right under applicable state laws to assert materialmens', mechanics', or other statutory liens. The Debtors seek only to pay outstanding and undisputed prepetition obligations to Lien Claimants with valid Statutory Liens as such Lien Claimants would have been paid in the ordinary course of the Debtors' business.

50. <u>Incurrence of Statutory Liens/Adequate Protection of Statutory Liens</u>. If the Debtors fail to continue paying the Obligations, it will create a substantial burden upon the estates and pervasive administrative costs and delays to the detriment of all creditors. Failure to pay certain of the Obligations may give rise to statutory liens that will need to be addressed prior to the Debtors concluding the asset sale that forms the primary objective of these Chapter 11 Cases. Moreover, under applicable law, if liens are filed, the parties asserting such liens may assert claims for costs and/or attorney's fees incurred in prosecuting their liens. The Debtors maintain that the ongoing and regular payment of such claims is the most efficient and effective means of adequate protection available under Section 361 of the Bankruptcy Code.

51. <u>Amounts Owing Under Joint Operating Agreements Are Payable as Cure</u>. The Debtors' contemplate assuming and assigning to a purchaser some (if not all) of its JOAs and similar rights. Because payment defaults under the JOAs must be cured prior to assumption and assignment, granting the relief requested herein will merely affect the timing, not the amount, of payment.

52. <u>Dependence on Avoiding Litigation Break-Down</u>. Some of the most important aspects of the Debtors' operations are their relationships with the parties holding the Obligations,

all of which comprise parties that may assert various claims and/or liens against certain assets of the Debtors. If these relationships are harmed, either through the non-payment of obligations due under leases and/or JOAs, or through the perceived difficulties of dealing with a chapter 11 debtor, the Debtors will encounter particularized controversies with each entity, unnecessary costs and distractions, and corresponding harm to their businesses with the possible loss of going concern value to the estates. Due to the very competitive nature of the Debtors' businesses, and strict lease provisions and statutes giving rise to lease cancellation rights or statutory liens, the parties holding the Obligations do not have the same dependence upon the Debtors

53. I believe that the relief requested in the JIB and Royalties Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the JIB and Royalties Motion should be approved.

### F.  Emergency Motion For Interim And Final Orders Providing Adequate Assurance Of Utility Payments (the "Utility Motion")

54. The Debtors seek entry of an interim order: (i) prohibiting utility companies from altering, refusing, or discontinuing services to the Debtors on account of prepetition invoices, pending entry of a final order granting the relief requested in the Utility Motion or the Interim Order becoming a final order; (ii) authorizing and approving the amount and method by which the Debtors may furnish certain utilities with adequate assurance of payment for post-petition utility services and directing the utilities to continue providing such services pending entry of the Final Order; and (iii) scheduling a final hearing on the Utility Motion within 30 days of the Petition Date.

55. Several Utilities provide the Debtors with traditional utility services, such as

telephone and communications services, electricity, water, sewer, gas, and other similar services that are necessary for the continued operation of the Debtors' day-to-day business operations. A list of all identified Utilities is attached to the Utility Motion as **Exhibit A**. The Debtors have made a good-faith effort to identify all Utilities and list them on the Utility Service List.

56. Uninterrupted utility service is critical to the ability of the Debtors to operate and maintain the value of their business and to maximize value for the benefit of creditors. The Debtors could not operate their businesses without utility service. Should any Utility refuse or discontinue service, the Debtors could be forced to cease or limit their business operations. Such a cessation would substantially disrupt operations and result in loss of revenues, which could irreparably harm the Debtors and their estates.

57. The Debtors submit that the availability of the Adequate Assurance Deposit (if timely requested), together with the Debtors' demonstrated ability to pay future utility service in the ordinary course of business constitutes sufficient adequate assurance of future payment to satisfy the requirements imposed by section 366 of the Bankruptcy Code. That said, if any Utility believes additional assurance is required, it may request such assurance under the procedures outlined in the Utility Motion.

58. I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Utility Motion should be approved.

      **G.**    **Emergency Motion For Authority To Limit Notice And Establish Master Service List Applicable To This Case (the "<u>Notice Motion</u>")**

59. The Debtors seek authority to limit the form of notice to be provided to all

creditors in the case who do not appear on the Master Service List and seek authority to establish the Master Service List to be used in these Chapter 11 Cases.

60. Over 5,000 persons may be entitled to receive notice in these Chapter 11 Cases. As such, notice of all documents filed in this case to each creditor and party in interest would be extremely burdensome and costly to the estate.

61. The Debtors, therefore, propose to establish a master service list that would include (a) the Office of the United States Trustee for the Western District of Oklahoma, (b) all known or alleged secured creditors, (c) the 20 largest unsecured non-insider creditors of the Debtor, (d) all known shareholders holding over 5% of a class of equity interests of the Debtor, (e) all of the Debtor's professionals, (f) all members of any official committee of unsecured creditors that may be appointed, (g) counsel for, and any professionals retained by, any official committee of unsecured creditors that may be appointed, (h) the United States Attorney's Office for the Western District of Oklahoma, (i) the Internal Revenue Service, (j) any persons who have filed a request for notice pursuant to Bankruptcy Rule 2002, (k) the Securities and Exchange Commission, (l) counsel for the Agent, and (m) any such other government agencies to the extent required by the Bankruptcy Rules and Local Rules of this Court.

62. I believe that the relief requested in the Notice Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the Notice Motion should be approved.

**H.     Application For Entry Of An Order Authorizing The Employment And Retention Of Crowe & Dunlevy, PC, As General Bankruptcy And Litigation Counsel For Debtors Retroactively To April 1, 2016 (the "C&D Application")**

63.     The Debtors request entry of an order authorizing the retention of Crowe & Dunlevy, P.C. Retroactively to the Petition Date as counsel to the Debtors. Crowe Dunlevy has served as counsel for the Debtors on a number of matters prior to the bankruptcy and is familiar with the Debtors, its assets and its operations.

64.     I believe that the relief requested in the C&D Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate its businesses in chapter 11 with the least amount of disruption possible. Accordingly, on behalf of the Debtors, I respectfully submit that the C&D Application should be approved.

Dated: April 1, 2016

*[signature]*

CLARK EDWARDS