**Dated: January 8, 2019**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| POSTROCK ENERGY CORPORATION, et al. | ) | Case No. 16-11230-SAH |
| | ) | Chapter 11 |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |
| | ) | |
| STEPHEN J. MORIARTY as Chapter 11 Trustee of Post Rock Energy Corporation, et al., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. 18-01023-SAH |
| | ) | |
| TERRY W. CARTER, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON TERRY W. CARTER'S MOTION TO DISMISS
AMENDED COMPLAINT WITH PREJUDICE, BRIEF IN SUPPORT
AND NOTICE OF OPPORTUNITY FOR HEARING [DOC. 29]**

Before the Court are the:

1.     Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548 and

550 and to Disallow Claims Pursuant to 11 U.S.C. § 502 [Doc. 1], filed on March 30, 2018 (the

"Original Complaint"), by Stephen J. Moriarty as chapter 11 trustee  ("Trustee") for PostRock

Energy Corporation, et al.[1] (collectively, "the PostRock Debtors");

2.        Amended Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C.

§§ 544, 547, 548 and 550 and to Disallow Claims Pursuant to 11 U.S.C. § 502 [Doc. 24], filed

on October 3, 2018 (the "Amended Complaint"), by Trustee;

3.        Terry W. Carter's Motion to Dismiss Amended Complaint with Prejudice, Brief

in Support and Notice of Opportunity for Hearing [Doc. 29], filed on October 31, 2018

(the "Motion"), by defendant Terry W. Carter ("Defendant"); and

4.        Plaintiff's Response to Terry W. Carter's Motion to Dismiss Amended

Complaint, Brief in Support [Doc. 34], filed on November 28, 2018 (the "Response"), by

Trustee.

## **OVERVIEW**

On April 1, 2016 (the "Petition Date"), the PostRock Debtors each commenced a

bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On the same day, the Court entered an order authorizing joint administration of the PostRock

Debtors' chapter 11 cases for procedural purposes pursuant to Federal Rule of Bankruptcy

Procedure 1015(b); however, the bankruptcy estates were not, and are not, consolidated.  On

April 7, 2016, the Court entered an order granting an agreed motion to appoint a trustee, and, on

-----

[1] The affiliated debtors are PostRock Energy Corporation, the parent corporation ('PostRock"), which owns directly, or indirectly, PostRock Energy Services Corporation ("PESC"), PostRock MidContinent Production LLC ("MidCon"), PostRock Eastern Production, LLC ("Eastern"), PostRock Holdco, LLC ("Holdco"), and STP Newco, Inc. ("Newco"; PostRock, PESC, MidCon, Eastern, Holdco and Newco are collectively referred to as the "PostRock Debtors").

April 8, 2016, Trustee was appointed the chapter 11 trustee in these jointly administered cases [Doc. 75].

In this adversary proceeding, Trustee originally sought to avoid and recover certain transfers as either preferential or fraudulent under 11 U.S.C. §§ 547, 548 and 550, and to disallow claims under 11 U.S.C. § 502(d)&(j).[2]  The Court previously dismissed the Original Complaint as not meeting the "Twombly/Iqbal plausibility standard" of pleading, finding the Original Complaint "muddle[d] the two causes of action for preferential transfers and fraudulent transfers, omit[ted] critical information, and ma[d]e numerous legal conclusions without facts to support them," but granted Trustee leave to amend.

The substantially altered and fleshed out Amended Complaint has now been filed addressing the deficiencies previously identified by the Court.  Nevertheless, Defendant again seeks to dismiss, with prejudice, the Amended Complaint for failing to meet the "Twombly/Iqbal plausibility standard."  Defendant's attacks on the Amended Complaint are generally unwarranted.  The Amended Complaint fairly apprises Defendant of the nature of the claims against him, raises allegations which, if proven at trial, would establish Trustee's right to recover, and moves the claims from merely conceivable to plausible.  Trustee is not required, nor expected, to state specific facts proving each element of his claim so long as fair notice of the claims and the grounds upon which they rest are set forth.  Higginbottom v. Mid-Del School District, 2016 WL 951691 (W.D. Okla. 2016); Harris v. Chevron U.S.A., Inc., 2015 WL 3746989 (W.D. Okla. 2015).

_____

[2]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

3

## JURISDICTION

The Court has jurisdiction to hear this Amended Complaint pursuant to 28 U.S.C.

§ 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.  Reference to the Court of this

matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by

28 U.S.C. § 157(b)(2)(B), (F) and (H).

## STANDARDS GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A plaintiff bears the burden of framing a complaint with enough factual matter to suggest

that he or she is entitled to relief,  Fed. R. Civ. P. 8.; Fed. R. Bankr. P. 7008; Robbins v.

Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).  But Federal Rule of Civil Procedure 8 does not

impose an onerous pleading standard.  In fact, Rule 8(a)(2) requires only "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Further, the philosophy of

Rule 8(a)(2) is reinforced by Rule 8(d), which permits alternative statements and inconsistent

claims and defenses, and Rule 8(e), which requires pleadings to be construed so as to do justice.

Therefore, federal courts have repeatedly emphasized that pleadings are to be construed liberally

in accordance with the justice mandate in Rule 8(e) and the general spirit of the Federal Rules.

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1215 (3d ed.).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint must contain

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Higginbottom, 2016 WL 951691, *2 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007))).  "That the court accepts

them as true, however, does not mean the allegations in a complaint are in fact true; a plaintiff is

not required to prove his case at the pleading stage."  Higginbottom, 2016 WL 951691, *2 (citing

4

Glover v. Mabrey, 384 F. App'x 763, 772 (10th Cir. 2010).   A complaint must allege facts which allow the court to believe that plaintiff has a reasonable likelihood of mustering factual support for the stated claims.  Higginbottom, 2016 WL 951691 (quoting Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)).  "Granting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'"  Higginbottom, 2016 WL 951691, *2 (quoting Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting Duran v. Carris, 238 F.3d 1268, 1270 (10th Cir. 2001) (internal quotation marks omitted))).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'"  Sanchez v. Hartley, 810 F.3d 750, 755 (10th Cir. 2016) (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))).

## STATEMENT OF FACTS FROM TRUSTEE'S COMPLAINT

### *Facts Applicable to All Causes of Action*

1.    PostRock is the parent company and wholly owns PESC and Constellation Energy Partners Management, LLC ("CEPM").  PESC is the primary operating entity for personnel and administrative services for the PostRock Debtors and wholly owns Holdco, Eastern, and MidContinent.  MidContinent, in turn, wholly owns Newco.

2.    From at least August 22, 2014, through September 2015, Defendant was Chief Executive Officer of PostRock and an "insider" within the meaning of Section 101(31) of the Bankruptcy Code.

3.      Defendant was an individual for whose benefit certain of the recoverable transfers alleged in this Amended Complaint were made, and/or an immediate or mediate transferee of such recoverable transfers.

4.      Although separate general ledgers were maintained for each PostRock Debtor, financial statements for PostRock were issued on a consolidated basis for book, audit, SEC reporting, and tax purposes.

5.      The general ledgers maintained for each PostRock Debtor are unreliable due to intercompany accounting inaccuracies, including the recording of certain assets and liabilities under the wrong entity's general ledger and not allocating expenses to each entity.  As such, the PostRock Debtors' separate entity general ledgers, trial balances, and other accountings may not report correct balances in either balance sheet or income statement accounts until consolidated.

6.      On December 20, 2012, the PostRock Debtors refinanced their existing revolving credit facility (the "Borrowing Base Facility"), with PESC and PostRock MidContinent Production, LLC, as borrowers, secured by a first lien on substantially all of the PostRock Debtors' assets.  The Borrowing Base Facility is guaranteed by all of the subsidiaries of PostRock other than non-debtor CEPM.  As of the Petition Date, the principal amount outstanding under the Borrowing Base Facility was approximately $65 million.

7.      The PostRock Debtors struggled financially due to the sharp decline in oil and natural gas prices.  The low price for oil and natural gas significantly affected the PostRock Debtors' revenues from sales of its oil and gas production.  Consequently, in February 2015, PostRock sought to sell substantially all of its assets, but was unable to locate a buyer

willing to make an offer sufficient to fully satisfy the outstanding financial obligations under the Borrowing Base Facility.

8. In February 2016, the PostRock Debtors defaulted under the Borrowing Base Facility, and in March 2016, the lender accelerated the balance of indebtedness rendering the entire principal balance plus all accrued interest immediately due and payable.

9. The PostRock Debtors' financial difficulties leading to the filing of the Bankruptcy Cases are attributable to a combination of factors, all of which placed significant stress on the PostRock Debtors' liquidity position in the years leading up to the Petition Date. PostRock's financial statements included in its publicly filed SEC Form 10-Q and 10-K filings, for the periods ended September 30, 2012, through September 30, 2014, show PostRock maintained negative total book equity between negative $17.2 million and negative $40.1 million.

10. In the fourth quarter of 2014, PostRock's financial statements indicated positive equity of approximately $18.2 million; however, PostRock's Forms 10-K for the year ended 2014 stated the value of oil and natural gas properties were calculated under the full cost method, which is a book value. Book value is not considered a fair value for solvency purposes. The book value using full cost method of accounting requires write downs and impairments to book value based on reserve pricing.

11. Additionally, on December 31, 2014, PostRock converted over $41 million in Series A Cumulative preferred stock and other items to equity. By the second quarter of 2015, PostRock's total book equity had decreased to negative $38.6 million and continued decreasing to negative $105 million by December 31, 2015.

12.    PostRock reported operating losses for each of the five years ending before the Petition

Date – 2011, 2012, 2013, 2014, and 2015.  PostRock's annual SEC Form 10-K for the

year ending December 31, 2014, filed on March 31, 2015, reported a net loss from

operations of $67,000.00.  However, the operating loss for the fourth quarter 2014 was

$1.07 million as compared to 2014's first quarter operating income of $703,000.00.  Per

PostRock's quarterly SEC 10-Q's, the operating losses were $7.8 million for the quarter

ending March 31, 2015, $47.4 million for the quarter ending June 30, 2015, and $41.3

million for the quarter ending September 30, 2015.  The unaudited financial statements

for the quarter ending December 31, 2015, shows an operating loss of $22.8 million,

resulting in a FY 2015 total operating loss of approximately $119.4 million.

13.    PostRock's annual SEC Form 10-K for the year ended December 31, 2014, filed on

March 31, 2015, and as reflected in the 2014 audit report, reported the White Deer

transactions had been mischaracterized and that the Series A Preferred Stock should have

been recorded as a liability from the outset, not equity.  As a result, PostRock was

required to restate its consolidated financial statements for the years 2010, 2011, 2012,

and 2013.  These mischaracterizations have to be taken into account in the solvency

analysis as far back as 2010 and the effect on the company's financial condition.

14.    PostRock's stock price continued to fall from $12.40 at April 1, 2014, to $0.30 at

December 31, 2015, or an approximate 96 percent decrease in stock price during the same

period.  Also, for the period December 31, 2014, to December 31, 2015, the stock price

decreased approximately 85 percent.

### *Transfers to or for the Benefit of Defendant*

15. At various times between 2010 and 2015, even when commodity prices were falling, PostRock was laying off employees, and PostRock's financial situation was increasingly dire, PostRock implemented bonus and retention incentive plans for certain PostRock employees.

16. The effect of these plans was to reward certain officers, directors, and/or employees with financial incentives and bonus payments even when PostRock was failing (or, at the very least, was in the "zone of insolvency").

17. Based on the PostRock Debtors' records, during the two years preceding the Petition Date, PESC made certain payments to Defendant.  The details of each of the payments by PESC to Defendant are as follows (collectively, the "Transfers"):

### Transfers within 90 Days of the Petition Date
### (the "Preference Period Transfer")

| Date | Amount | Reason/Trans. Type | Title On Payroll |
|------|--------|--------------------|------------------|
| 3/18/2016 | $27,962.00 | Deferred Comp-vesting | Chief Executive Officer |
| 3/18/2016 | $34,068.75 | Deferred Comp-distribution | Chief Executive Officer |
| **Total** | **$62,030.75** | | |

### Transfers within One Year of the Petition Date
### (the "Preference Period Transfers")

| Date | Amount | Reason/Trans. Type | Title On Payroll |
|------|--------|--------------------|------------------|
| 3/18/2016 | $27,962.00 | Deferred Comp-vesting | Chief Executive Officer |

| Date | Amount | Reason/Trans. Type | Title On Payroll |
|------|--------|--------------------|--------------------|
| 3/18/2016 | $34,068.75 | Deferred Comp-distribution | Chief Executive Officer |
| 9/18/2015 | $100,000.00 | Severance | Chief Executive Officer |
| 4/3/2015 | $75,000.00 | Bonus | Chief Executive Officer |
| **Total** | **$237,030.75** | | |

## Transfers within Two Years of the Petition Date without Reasonably Equivalent Value (the "Potential Fraudulent Transfers")

| Date | Amount | Reason/Trans. Type | Title On Payroll |
|------|--------|--------------------|--------------------|
| 3/18/2016 | $27,962.00 | Deferred Comp-vesting | Chief Executive Officer |
| 3/18/2016 | $34,068.75 | Deferred Comp-distribution | Chief Executive Officer |
| 9/18/2015 | $100,000.00 | Severance | Chief Executive Officer |
| 4/3/2015 | $75,000.00 | Bonus | Chief Executive Officer |
| **Total** | **$237,030.75** | | |

## Transfers within Four Years to an Insider while Insolvent (the "Potential Section 117 Transfers")

| Date | Amount | Reason/Trans. Type | Title On Payroll |
|------|--------|--------------------|--------------------|
| 3/18/2016 | $27,962.00 | Deferred Comp-vesting | Chief Executive Officer |
| 3/18/2016 | $34,068.75 | Deferred Comp-distribution | Chief Executive Officer |
| 9/18/2015 | $100,000.00 | Severance | Chief Executive |

| | | | |
|---|---|---|---|
| Officer | 9/8/2015 | $44,423.28 | PTO Payout |
| Chief Executive Officer | 4/3/2015 | $75,000.00 | Bonus |
| Chief Executive Officer | 9/19/2014 | $ 6,730.77 | PTO Payout |
| Chief Executive Officer | 8/22/2014 | $ 1,346.15 | PTO Payout |
| Chief Financial Officer | **Total** | **$289,530.95** | |

### Facts Supporting Avoidance of Preference Period Transfers
### Under Section 547 of the Bankruptcy Code

18.  On or about March 10, 2015, the Compensation Committee of the Board of Directors of PostRock (the "Compensation Committee") approved the payment of a $75,000.00 discretionary bonus (the "2015 Discretionary Bonus") to Defendant as a senior management performance bonus.

19.  On or about April 3, 2015, Defendant received a transfer in the amount of $75,000.00 in satisfaction of the declared 2015 Discretionary Bonus.

20.  Payroll records indicate the $75,000.00 transfer was made by PESC and processed through an ADP payroll account.

21.  In keeping with historical practices, the ADP payroll account processed funds by drafting funds from a BBVA Compass account in the name of PostRock.

22.  On March 18, 2016, Defendant received a preferential payment of deferred compensation totaling $62,030.75 (the "Deferred Compensation Payment").

23. Payroll records indicate the Deferred Compensation Payment was made by PESC and processed through an ADP payroll account.

24. On September 18, 2015, Defendant received a preferential payment for severance totaling $100,000.00 (the "Severance Payment").

25. Payroll records indicate the Severance Payment was made by PESC and processed through an ADP payroll account.

26. In keeping with historical practices, the ADP payroll account processed funds by drafting funds from a BBVA Compass account in the name of PostRock.

27. There is no services agreement or other agreement governing payroll between PostRock and PESC. Further, intercompany accounting records regarding payroll are unavailable or unreliable.

28. From at least August 22, 2014, through September 2015, Defendant was employed as the Chief Executive Officer of PostRock and was an Insider.

| Date of Transfer | Officer Per Income Tax Returns | | Title per SEC Documents | Title per SOFA | Title per Board of Director Minutes |
|---|---|---|---|---|---|
| 3/18/2016 | Yes | Officer - Per 1125-E | Former Chief Executive Officer and President | Former CEO | Former Chief Executive Officer and President |
| 3/18/2016 | Yes | Officer - Per 1125-E | Former Chief Executive Officer and President | Former CEO | Former Chief Executive Officer and President |
| 9/18/2015 | Yes | Officer - Per 1125-E | Former Chief Executive Officer and President | Former CEO | Former Chief Executive Officer and President |
| 9/8/2015 | Yes | Officer - Per 1125-E | Former Chief Executive Officer and President | Former CEO | Former Chief Executive Officer and President |

| 4/3/2015 | Yes | Officer - Per 1125-E | Chief Executive Officer and President | Former CEO | President and Chief Executive Officer |
| 9/19/2014 | Yes | Officer - Per 1125E | Chief Executive Officer and President | N/A | President and Chief Executive Officer |
| 8/22/2014 | Yes | Officer - Per 1125E | Chief Executive Officer and President | N/A | President and Chief Executive Officer |

29.    At all relevant times between April 1, 2015, and the Petition Date (the "Insider Preference Period"), the sum of PESC's debts exceeded all of PESC's property at a fair valuation and was, thus, "insolvent" as that term is defined by Section 101(32) of the Bankruptcy Code.   Further, the PostRock Debtors were also insolvent on a consolidated basis.

30.    As a result of the $237,030.75 payment, Defendant received 100 percent of the amount owed with regard to the 2015 Discretionary Bonus, the Deferred Compensation Payment and the Severance Payment.

31.    From the Petition Date, the PostRock Debtors' cash flow budgets show a cash operating loss.  As evidenced by the PostRock Debtors' schedules filed in the bankruptcy case, as well as proof of claims received to date, the PostRock Debtors continued to have cash troubles in that the working capital/asset-liability ratio continued to decline beginning in the first quarter of 2014 continuing into 2016 before the filing the Bankruptcy Cases. Therefore, it is unlikely the unsecured creditors of the PostRock Debtors, including those of PESC, will receive a full payout of their claims.

### *Facts Supporting Avoidance of Fraudulent Transfers Under Sections 544(b),*
### *Incorporation Section 116 of the OUFTA, and 548 of the Bankruptcy Code*

32.    During the two (2) year period prior to the Petition Date, or between April 1, 2014, and April 1, 2016, Defendant received the Potential Fraudulent Transfers totaling not less than $237,030.75.

33.    PESC and the PostRock Debtors received no value in exchange for the $230,030.75 payments to Defendant.

34.    At all relevant times between April 1, 2014, and April 1, 2016 (the "Lookback Period"), PESC was insolvent.  Further, the PostRock Debtors were also insolvent on a consolidated basis.

35.    Additionally, from at least August 22, 2014, through September 2015, the  Defendant was employed as the Chief Executive Officer of PostRock and an Insider.

36.    Further, the $237,030.75 payments were not regular earnings or wages.  Rather, the payments were comprised of various discretionary bonus payments, deferred compensation and severance.  Thus, these payments were not made in the ordinary course of business.

37.    Payroll records indicate the $237,030.75 payments were made by PESC and processed through an ADP payroll account.

38.    In keeping with historical practices, the ADP payroll account processed funds by drafting funds from a BBVA Compass account in the name of PostRock.

14

39.    There is no services agreement or agreement governing payroll between PostRock and

PESC.  Further, upon information and belief, intercompany accounting records regarding

payroll are unavailable or unreliable.

### *Additional Facts Supporting Avoidance of Fraudulent Transfers Under*
### *Section 544(b) of the Bankruptcy Code and Section 117 of the OUFTA*

40.    From at least August 22, 2014, through September 2015, Defendant was employed as the

Chief Executive Officer of PostRock Corp.

41.    At all relevant times, Defendant knew, or had reason to know, the financial condition of

PESC and the PostRock Debtors.

42.    Payroll records indicate the Potential Section 117 Transfers were made by PESC and

processed through an ADP payroll account.

43.    In keeping with historical practices, the ADP payroll account processed funds by drafting

funds from a BBVA Compass account in the name of PostRock.

44.    There is no services agreement or other agreement governing payroll between PostRock

and PESC.  Further, intercompany accounting records regarding payroll are unavailable

or unreliable.

### **CONCLUSIONS OF LAW**

The arguments made in Defendant's Motion suggest Defendant's counsel has lost sight of

the current standard of "notice" pleading and seeks a return to the days of long-winded,

proof-oriented complaints.  "What the rules of notice pleading call for is a complaint alleging

enough facts to raise a reasonable expectation that discovery will reveal evidence" to support the

stated claims.  Matthews v. Bergdorf, 889 F.3d 1136, 1149 (10th Cir. 2018) (citing Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Ridge at Red

Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007) ("[T]he complaint must give

the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual

support for these claims.")).  Trustee has now satisfied this burden with regard to his claims

against Defendant.

The Court interprets Trustee's Amended Complaint as identifying PESC as the

transferor,[3] and below, it endeavors to briefly and succinctly state its rulings on the specific

arguments made in the Motion so the parties can proceed with finally litigating the merits of this

matter.

## I.    THE AMENDED COMPLAINT ALLEGES THAT PESC HAD AN INTEREST IN THE PROPERTY TRANSFERRED.

Trustee's Amended Complaint clearly states that "PESC made payments" to Defendant

(Amended Complaint, ¶ 31) and that such payments were made through an ADP payroll account

---

[3]Trustee's Amended Complaint clearly states "PESC made certain payments to Defendant" (Amended Complaint, ¶ 31), and further focuses on PESC as the transferor in its stated claims.  However, the Amended Complaint also alludes to avoidance and recovery of transfers "made by any of the PostRock Debtors" (Amended Complaint, ¶ 2).  Additionally, Trustee's Response states "Trustee will seek to avoid and recover from defendant for whose benefit transfers were made by any of the PostRock Debtors," and alleges "Trustee has sufficiently stated a claim on behalf of all Debtors." (Response, p. 5).  The Court strongly disagrees.  In its September 6, 2018, order dismissing Trustee's Original Complaint, the Court found it deficient, in part, due to failure to identify the transferor, stating "because the 'PostRock Debtors' consist of six different entities, which have been joined for procedural purposes only, the Complaint does not adequately identify the transferor."  Having emphasized that Trustee's identification of the specific PostRock Debtor making the transfers was necessary and critical, the Court construes the Amended Complaint as identifying only PESC as the transferor.  Absent Trustee being granted leave to amend, the Court will not consider the transfers as being made by any other PostRock Debtor.

(Amended Complaint, ¶ 34). PESC's exercise of control over the payments make it plausible, rather than merely conceivable, that PESC had an interest in the funds paid to Defendant.

## II.    ONLY TRUSTEE IS A PLAINTIFF IN THIS ADVERSARY PROCEEDING.

Defendant misses the mark in suggesting that the bankruptcy estates of PostRock, Holdco, Eastern, Midcontinent, and Newco are plaintiffs in this action. Trustee is the only plaintiff, and he is trustee for not only PESC but also PostRock, Holdco, Eastern, Midcontinent, and Newco, in their jointly administered bankruptcy cases. The Court finds Trustee's identification of himself in the Amended Complaint as neither conclusory nor muddled, but simply accurate.

## III.    INSOLVENCY IS PLAUSIBLY PLED.

Courts liberally review constructive fraud claims brought by a trustee, given his position as a third party outsider to the debtor's transactions. In re PennySaver USA Publishing, LLC, 587 B.R. 445, 456-57 (Bankr. D. Del. 2011) (citing In re FAH Liquidating Corp., 572 B.R. 117, 127 (Bankr. D. Del. 2017)). Herein, Trustee is obligated to plausibly state that PESC, the transferor, was insolvent at the time each of the Transfers were made. The Bankruptcy Code defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation." LTF Real Estate Co., Inc. v. Expert South Tulsa, LLC, (In re Expert South Tulsa, LLC), 522 B.R. 634, 652 (10th Cir. BAP 2014) (citing 11 U.S.C. § 101(32)). The test for insolvency under the Oklahoma Uniform Fraudulent Transfer Act is also a "balance sheet" test identical to the test for insolvency under the Bankruptcy Code. Stillwater Nat'l Bank and Trust Co. v. Kirtley (In re Solomon), 299 B.R. 626, 633, 638 (10th Cir. BAP 2003).

17

Without a doubt, the Original Complaint contained only threadbare and conclusory allegations that PESC was insolvent when the Transfers were made. The difficulty facing Trustee in correcting such allegations in the Amended Complaint are the facts that: (i) the PostRock Debtors maintained consolidated books and records for book, audit, SEC reporting, and tax purposes; (ii) while separate ledgers were maintained for each PostRock Debtor, the entity ledgers have proven to be unreliable and inaccurate; and (iii) Trustee was not in control of, and had no input in, the preparation of the consolidated books and records or the entity ledgers at the time of the Transfers, having been appointed chapter 11 trustee only after the cases were filed and having no connection to the PostRock Debtors prior to his appointment.[4] While these facts and circumstances may ultimately make proving insolvency on an entity basis difficult, they should not be a barrier to Trustee seeking relief.

It is settled law that the determination of insolvency is a fact question, and fact questions are not determined on motions to dismiss. LaMonica v. CEVA Group, PLC (In re CIL Limited), 582 B.R. 46, 104 (Bankr. S.D. N.Y. 2018) (citing Lawson v. Ford Motor Co. (In re Roblin Indus.), 78 F.3d 30, 35 (2d Cir. 1996) and Tronox Inc. v. Andarko Petroleum Corp. (In re Tronox Inc.), 429 B.R. 73, 97 (Bankr. S.D. N.Y. 2010)). Accordingly, the Court will consider "only whether the Trustee has alleged facts from which the Court can reasonably infer that it is plausible" that PESC was insolvent at the relevant times. CIL Limited, 582 B.R. at 105 (citing Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC), 571 B.R. 241, 262 (Bankr.

---

[4]See Verified Statement of Stephen J. Moriarty [Doc. 74-1], filed on April 8, 2016, in the Bankruptcy Case. It is well established that a court may take judicial notice of its own records as well as records of other courts, particularly in closely related cases. Hutchinson v. Hahn, 402 F. App'x 391, 394-95 (10th Cir. 2010) (citing St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979)).

18

E.D. Ky. 2017)).  A complaint must contain enough factual information to plausibly show that

the assets of the debtor exceeded its liabilities at the time(s) of the transfers.  Spradlin v.

Wrigley's 7-711, Inc. (In re Licking River Mining, LLC), 572 B.R. 830, 844 (Bankr. E.D. Ky.

2017).

The Court finds Trustee has done an adequate job of plausibly stating that PESC was

insolvent.  First, Trustee alleged that, for the period between April 1, 2015, and the Petition Date,

"the sum of PESC's debts exceeded all of PESC's property at a fair valuation, and was, thus,

"insolvent" as that term is defined by section 101(32) of the Bankruptcy Code," and further that

PESC was insolvent for the period between April 1, 2014, and the Petition Date (Amended

Complaint ¶¶ 43, 48).  Additionally, PESC was a wholly owned subsidiary of PostRock and

primarily an operating entity for personnel and administrative services, a type of entity which

generally holds few assets.  Nevertheless, PESC was one of two primary obligors under the $200

million Borrowing Base Facility with Lenders, and, on the Petition Date, the outstanding

indebtedness was approximately $65 million.  When oil and gas prices sharply declined in 2014,

the PostRock Debtors faced declining asset values, as reflected by negative book equity of $17.2

million in September 2012, to negative $40.1 million in September 2014.  Revenues also

declined, operating losses mounted, and stock prices declined 413 percent from April 1, 2014, to

December 31, 2015.  From these facts, Trustee paints a plausible picture of insolvency for the

PostRock Debtors as a whole and separately.

Because the Amended Complaints states that (i) PESC was an employee and

administrative services company for the PostRock Debtors from which it can be inferred PESC

held little assets, and (ii) PESC was primarily liable on the $200 million Borrowing Base Facility

with a balance of $65 million on the Petition Date and at a level exceeding the combined asset

base of the PostRock Debtors by February 2015,[5] Trustee has plausibly stated that PESC was

insolvent at the relevant times.  At trial, as opposed to on a motion to dismiss, Trustee will be

required to prove PESC's insolvency at the relevant times on an entity basis – as the PostRock

Debtors' estates remain separate, having not been substantively consolidated but only jointly

administered.

## IV.    THE AMENDED COMPLAINT ADEQUATELY PLEADS DEFENDANT IS AN INSIDER OF PESC.

The Amended Complaint clearly states that Defendant was the Chief Executive Officer of

PostRock for the time period between August 22, 2014, through September 2015.  Amended

Complaint, ¶ 14.  Under Section 101(31)(B)(ii and iii), an officer and a person in control of a

debtor are considered insiders.  Thus, Defendant is considered an insider of PostRock.

In turn, PostRock owns 100 percent of PESC's stock.  Amended Complaint, ¶ 16.  Under

Section 101(31)(E), an affiliate or insider of an affiliate is considered an insider of the debtor.

An affiliate is defined as "an entity that directly or indirectly owns, controls, or holds with power

to vote, 20 percent or more of the outstanding voting securities of the debtor."  11 U.S.C.

§ 101(2)(A).  As PESC is wholly owned by PostRock, and Defendant is an insider of PostRock,

Defendant is also an insider of PESC as he is an insider of an affiliate of PESC.

---

[5]As of the Petition Date, PESC's schedules reflected nominal assets of $220,835.04 compared to liabilities of $62,026,844.00.

V.    **THE AMENDED COMPLAINT PLAUSIBLY STATES THAT PESC DID NOT RECEIVE REASONABLY EQUIVALENT VALUE.**

Similar to insolvency, courts also liberally review claims for constructive fraud based on a lack of reasonably equivalent value because of the trustee's position as a third party to the debtor and its transactions.  PennySaver, 587 B.R. at 457.  On its face, the Amended Complaint plausibly states that no reasonably equivalent value was received in exchange for the Potential Fraudulent Transfers for a very simple reason.  The Amended Complaint alleges that the Potential Fraudulent Transfers were made by PESC.  However, Defendant was not employed by PESC, but rather by PostRock.  Yet, the Potential Fraudulent Transfers were all made by PESC, plausibly suggesting the absence of reasonably equivalent value in exchange.  Courts have long recognized that transfers to benefit non-debtors or even affiliates of debtors provide no direct benefit to the debtor.  Kreigman v. Wallin Harrison, PLC (In re LLS America, LLC), 2013 WL 6388564 (Bankr. E.D. Wash. 2013) (citing Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991 (2$^d$ Cir. 1981) and Leibowitz v. Parkway Bank and Trust Co. (In re Image Worldwide), 139 F.3d 574, 578 (7th Cir. 1998)).

In this instance, Trustee states a sufficient, albeit minimum, set of facts to place the issue of value received and the reasonable equivalence thereof in controversy.  See In re Petters Co., Inc., 495 B.R. 887, 920 (Bankr. D. Minn. 2013).  The Amended Complaint satisfies the pleading requirements that PESC did not receive reasonably equivalent value for the Potential Fraudulent Transfers.

## VI.     TRUSTEE'S SECTION 117(B) CLAIM STATES A CLAIM.

Defendant argues Trustee does not sufficiently plead facts that the PTO Payouts or the

Severance Payment were made in satisfaction of antecedent debts.[6]  A complaint must plead at

least some facts that make it plausible that a debtor/creditor relationship existed from which an

antecedent debt arose, such as any "contracts between the parties or any description of goods or

services exchanged."  See, e.g., Miller v. Mitsubishi Digital Elecs. Am. Inc. (In re Tweeter

Opco), 452 B.R. 150, 155 (Bankr. D. Del. 2011).

Under most employer leave policies, an employee accrues "Paid Time Off" ratably in

each pay period based on factors like length of service, weekly hours, and job grade or

classification.  It is a right or benefit earned on the basis of service already rendered.  Therefore,

PTO Payout made on account of Paid Time Off not actually taken would relate to Paid Time Off

already earned or accrued for which the employer has a liability.  Therefore, the Court finds it is

plausible that the PTO Payouts are in satisfaction of claims of Defendant that arose before the

transfers, i.e., antecedent debts.[7]

The Court also finds it plausible that the Severance Payment is on account of an

antecedent debt.  Although Defendant's right to receive the Severance Payment may not have

arisen until termination of Defendant's employment, the liability for the Severance Payment on

---

[6]Defendant does not specifically address the Bonus paid on April 3, 2015, or the Deferred
Compensation Transfer of March 3, 2016 in his Section 117(B) antecedent debt argument, and
therefore, has waived any objection thereto.

[7]However, some of the Potential Section 117B Transfers appear to be outside the
appropriate look-back period.  See 24 Okla Stat. Ann. § 121(3) (cause of action pursuant to
Section 117B is extinguished unless brought within one (1) year after the transfer was made or
the obligation was incurred).

PostRock's part likely arose prior to that time under an employment contract or severance agreement.  See, e.g., In re Commercial Financial Services, Inc., 246 F.3d 1291, 1295 (2001). Again, Defendant has been provided fair notice of the claims against him and the grounds upon which they rest, and Trustee is not required to prove his case in the Amended Complaint.

## **CONCLUSION**

For the reasons set forth above, the Motion is DENIED.  Defendant is directed to file an answer to the Amended Complaint no later than fourteen (14) days after entry of this Order.

IT IS SO ORDERED.

# # #